[In the Matter of the Petition of the State of Michigan for the Sale of certain Lands for the Taxes assessed thereon.]

Appeal from Wayne (Chambers, J.) Apl 9.—Apl 22 (1885).

Petition for tax sale. The State appeals. Affirmed.

Attorney General *Moses Taggart* for the State. The sufficiency of notice by publication before taking judgment for taxes is recognized in *New Orleans Drain Co.* 11 La. Ann. 338; *Fox v. Turtle* 55 Ill. 377; *New Orleans v. Cordiville* 10 La. Ann. 732; *Cadmus v. Jackson* 52 Penn. St. 295; *McClurg v. Ross* 5 Wheat. 116; *Frostman v. Ruggles* 58 Ill. 207; *Spellman v. Curtenius* 12 Ill. 411; *Thatcher v. Powell* 6 Wharton 119; as far as authority and precedent go, it seems to be left entirely with the legislatures in their discretion to say whether notice shall be actual or constructive: Desty on Taxation 721; *Dousman v. St. Paul* 23 Minn. 395; Cooley on Taxation 334; *State v. Guiterez* 15 La. Ann. 190; the proceeding is one in rem purely: *Schaeffer v. People* 60 Ill. 179; *Parks v. Miln* 48 Ill. 360; courts of chancery have been given authority to enforce tax liens in behalf of the State: *State v. Blake* 49 Texas 763; the Legislature is vested with absolute right of legislation unless restrained by the Constitution, and can determine how parties shall be brought into court: *State v. Guiterez* 15 La. Ann. 190; *New Orleans Drain Co.* 11 La. Ann. 338; state legislatures are no more restrained in their powers than the British Parliament; *People v. Morrel* 21 Wend. 563; *Butler v. Palmer* 1 Hill 324; *Bloodgood v. Mohawk & Hudson R. R.* 18 Wend. 9; *Legget v. Hunter* 19 N. Y. 445; a judgment by a divided court is held to have the same effect as any other judgment. *Lyon v. Ingham Circuit Judge* 37 Mich. 377.

*John C. Donnelly* and *Fred A. Baker* for Charles F. Campau, the owner of the land. Due process of law is intended to secure to the citizen the right to a trial according to the forms of law of the questions of his liability and responsibility, before his person or his property shall be condemned: *Parsons v. Russell* 11 Mich. 121. Except

54 MICH—27

in those cases where proceedings to collect the public reve-
nue may stand upon a peculiar footing of their own, it is
an inflexible principle of constitutional right that no person
can legally be divested of his property without remuneration
or against his will, unless he is allowed a hearing before an
impartial tribunal, where he may contest the claim set up
against him, and be allowed to meet it on the law and facts:
*Ames v. Port Huron &c. Co.* 11 Mich. 148.   The words
" due process of law" cannot mean less than a prosecution
or suit, according to the prescribed forms and solemnities
for ascertaining guilt, or determining the title to property:
*Porter v. Taylor* 4 Hill 140.   An order of sale not made
upon any inquiry or determination by the court, but as a
matter of course and because it is requested by an executive
officer, is not a judicial order or decree in any proper sense;
it has not the substance of a judicial proceeding, and con-
structive service, by publication, in ordinary civil or equit-
able proceedings, has never obtained except in cases where
personal service was impracticable:   *Mason v. Messenger* 17
Ia. 261; *In re Empire Bank* 18 N. Y. 199.

*Charles A. Kent,* a member of the Tax Commission, of
counsel for the State.   *   *   No act of the Legislature
should ever be held void by an equally divided court.   When
such a case occurs all should unite in a judgment affirming
its validity.   The consequences of holding an act void, on
which the people have acted for years, ought always to be
borne in mind by judges.   The judgment of the Court in
such a case is a total destruction of all which has been built
on the statute, and the Court is powerless to provide a sub-
stitute for the act destroyed.   *   *   *

III. *Difficulties in the Collection of Taxes, and Attempts
by the Legislature of Michigan to Avoid these Difficulties.*
—It is plain that compulsion must be at the back of every
attempt to collect taxes.   Many men will not pay willingly
debts freely contracted for their own benefit.   Such persons
are still less likely to pay taxes assessed, it may be, for objects
with which they do not sympathize, and in which, at the
most, their interest seems slight.   And the persons in any
community are probably few, who, on merely moral grounds,
will contribute their share to the public burdens.   Compul-
sion must therefore be the back-bone of every tax law, and
the force used must be great enough to effect its object; and
if harsh means are necessary, harsh means must be used.
The State must have its revenues, or all government stops;
and if loopholes are left in the law, so that a considerable

portion of the property escapes, then those who do pay have to make up the deficiency, and there comes general dissatisfaction and an increasing number of attempts to escape the common burden. The necessary thing about a law for the collection of taxes is that its operation is successful, that all the property assessed bears its proper burdens.

How shall an unwilling tax-payer, or indeed any unwilling debtor be coerced? Imprisonment for debt is abolished. There remains but one other remedy. The delinquent's property must be seized and sold. And here the State is at disadvantage as compared with a private creditor. The latter can buy his debtor's property at such sale, and use it so as to get an income therefrom. The State cannot do this. If it buys, it can hope to realize only by some subsequent sale. Its taxes are secured only when a sale has been effected to some third party. It must sell, therefore, to such party. The State is interested in the good of all its tax-payers. It desires to do as little injury as possible, even to those who refuse to contribute their share to its support. What are the essentials of a sale which shall succeed in bringing the needed revenue, and yet shall be as just and as little burdensome to the delinquent tax-payer as possible?

They are these: 1. The tax assessed must be just, or at least levied according to law. 2. The purchaser must know exactly what he is buying. 3. The sale must be public and so as to secure as great competition as possible. 4. The persons interested in the property to be sold must, so far as practicable, have notice of the sale, so that they may protect their property. I will consider these essentials in their order.

1. The tax assessed must be just, or at least levied according to law. Here are two essential steps ; the preparation of the lists of property on which the taxes are to be paid, and the determination of the amount of taxes to be raised, and its division among the persons and property listed. The method in which these steps shall be taken should be fixed by general laws. But the carrying out of the laws, and the amount of local taxes have to be left to each township or other municipality. The officers of each township are elected each year. No special knowledge is or can be required of them. To such inexperienced and ignorant officers is left the administration of complicated laws, and upon their compliance with the law has depended the validity of every tax. There have been varying decisions as to what requirements of the law are essential and what merely directory, but our courts have consistently held that a non-compliance with any

essential provision of the law rendered a tax levied under it void. And sometimes, owing to a fact of which I shall speak hereafter, the courts have exercised an extraordinary acuteness in magnifying what seem non-essentials into fatal defects.

Usually defects of this kind do not affect the substantial justice of the tax, but in some townships, where there is a large amount of non-resident property, the local officers deliberately undertake to put upon it an undue proportion of the taxes, and if they succeed, the law is plainly violated and a gross wrong perpetrated. The only full remedy for such a state of things is the improvement of the local officers, the election of men who know the law, and have industry and independence enough to follow it. It is obvious that such a remedy cannot be obtained by any change in the law. It must come, if at all, through a general improvement of the electors in knowledge and integrity. A partial remedy has been sought by the Legislature (Laws of 1869, p. 377), in providing that no tax authorized shall be held invalid for any matter of form not prejudicing the rights of the party assessed : And this provision remained until 1882, but it does not seem to have accomplished much, since under it taxes are held invalid for want of a proper certificate by the supervisor *Dickison v. Reynolds* 48 Mich., 158; *Sinclair v. Learned* 51 Mich., 335.

If the State can collect its taxes only by showing that the local assessing and collecting officers have adhered to the law in all matters which have heretofore seemed to the courts essential, then I fear that all hope of such collection must be abandoned whenever a tax-payer will spend the time and money necessary to fight a tax to the utmost. But surely the taxes must be collected, and the law must somehow be made so that taxes essentially just may be collected, even against the most litigious tax-payer.

2. The purchaser must know exactly what he is buying. The importance of this requirement can hardly be overrated. If a private individual offers a store for sale, but gives no assurances that the purchaser will get a good title, of course he cannot sell, or can sell only for a trifle. And the State is no better than a private individual in this respect, and yet Michigan has been doing this very thing from its origin. It offers lands for sale, telling the purchaser that he must take the risk of the title, and telling him also, most of the time, that if the title fail, he will lose the purchase money. The natural result follows. At tax sales, purchasers are few.

Those who bid do it in the spirit of gamblers. They know that they are taking large risks, that perhaps not one title in a hundred is good. Seldom does any one pay the taxes on a piece of land for less than the land. There is no real competition. Prudent, honorable men will not deal in tax titles. The business is left to a class careless of reputation, and unmerciful.

There are several difficulties in giving proper assurances to a purchaser :

(*a*) The chief of these is the fact that the right of the State to sell depends on the validity of the lien it is seeking to enforce, and this upon the proceedings of the local officers who have levied the tax. It is impossible that one who contemplates purchasing a tax title should look into these proceedings before a purchase. The task would be an arduous one. It would require the best legal talent. The decision of the best lawyer in favor of the validity of a tax would be very uncertain. If an examination were made, the purchaser might not get the land. The only practical way for one dealing in tax titles is to assume that they are likely to be invalid. He knows, however, that they are at least an apparent incumbrance, and that the owner of the land will ordinarily be likely at some time to pay some sum less than the cost of a litigation to get rid of the incumbrance. On this theory generally tax titles are bought, but very seldom is the tax paid for any part of the land offered less than the whole.

(*b*) Out of the fact last stated grows another serious difficulty in enforcing tax titles. The tax-title owner has paid a trifle for valuable property. He seeks to enforce his rights against an owner of the property who has paid full value, and who has been guilty of no fault but neglect. The owner of the tax title seems an extortioner, trying, it may be, to deprive a poor man of his homestead, his all. The sympathies of judge and jury are against him. The latter are sure to find every question of fact in favor of the original owner. And the judge is impelled, by a sense of justice, to find some legal defect in the tax title. "Where there is a will there is a way," and the result is a legal decision, which not only gratifies the court's sense of justice in that case, but affords another rule which tends to make all such titles worthless. This feeling in judge and jury, which makes it almost impossible for the owner of a tax title to a valuable piece of land, bought for a trifle, to succeed in a controversy with the original owner, is a very strong one. It must somehow be got rid of, or tax titles can

never be a secure investment.   The best way is the adoption
of a system which, after giving the tax-payer the fullest chance
to defeat unjust taxes, will give the purchaser such security
as will generally prevent sales at much below the real value
of the property.   If hard cases under the best possible system
will sometimes occur, the courts must be impressed with the
fact that it is their duty to enforce general rules necessary to
the public good, though individuals may suffer injustice.

(c) The tenderness of the Anglo-Saxon mind in depriving
a man of his realty, has made a third difficulty for the pur-
chaser of land at a tax sale to determine what he is getting.
The collector of taxes, when necessary, may seize and sell on
very short notice any personal property of a person to whom
taxes are assessed, and from such sale there is no redemption.
But where a tax can be collected only by a sale of the lands on
which it is assessed, not only is the sale postponed for many
months, but after a sale a tax-payer in this State, and generally
in this country, has been given one or more years in which
he may redeem.   The effect of this is that the purchaser at
a tax sale, even where the previous proceedings are all regu-
lar, has no certainty of anything, except that he has loaned
his money for the period of redemption or less, at the option
of the tax-payer.   But men of means do not care to lend
their money in driblets for an uncertain period at the ordin-
ary rates of interest. The result is that the law must provide
for redemption only on the payment of a great rate of inter-
est.   And this again increases the amount to be paid so con-
siderably as to constitute a considerable reason why the owner
of the property should contest the validity of the tax title.

Again, the fact that there is a redemption almost takes
away the possibility that there should be any competition,
unless from persons having a previous interest in the land, to
get a tax title.   There can be no great competition to loan
money which may be paid the next day.   The law, by reason
of its tenderness for the tax-payer, gives him a period of
redemption, and this makes it almost certain that if any piece
of land is offered for taxes, the whole or none will be sold.
The same folly is shown in the provisions of law for the sale
of real estate on execution, or on the foreclosure at law
of mortgages.   In these cases, as well as in the sale of
land for taxes, the law makes careful provisions to attract
bidders by extensive advertisement, and then takes away
almost all chance for competition by providing a period of
redemption.

The Legislature of Michigan has made many attempts to

improve the position of purchasers of tax titles. Its members have to some extent realized what would seem sufficiently obvious that the State, like a private person, cannot sell to advantage land when no assurance of title can be given to the purchaser. Though the statutes of 1827 and the revised laws of 1833 provided "that a tax deed should vest in the purchaser an absolute estate in fee simple, subject to all the claims the territory of Michigan should have thereon, and should be conclusive evidence that the sale was regular according to the provisions of the act," this Court held that the deed was conclusive only as to the regularity of the sale, and left the purchaser to prove that the previous proceedings were according to law : *Rowland v. Doty* Har. Ch. 3 ; *Scott v. Detroit Young Men's Society* 1 Doug. (Mich.) 121 ; *Latimer v. Lovett* 2 Doug. (Mich.) 204. These decisions made tax titles worthless.

In 1842 and 1843, the Legislature provided that tax deeds should be "prima facie evidence of the regularity of all the proceedings to the date of the deed." This statute was sustained by the courts, has ever since been the law, and is the source of whatever value tax titles had prior to 1882. *Sibley v. Smith* 2 Mich. 493 ; *Lacey v. Davis* 4 Mich. 140.

The burden is now thrown upon a person who would resist a tax title, to point out its defects, and it is usually cheaper to buy the title than to employ a competent person to ascertain the defects.

In 1858 the Legislature provided that, after tax deeds have been recorded a certain period, they shall be conclusive evidence of title: Laws of 1858, p. 176, et seq. But this statute was held invalid. *Waldby v. Callendar* 8 Mich. 430 ; *Quinlon v. Rogers* 12 Mich. 168. A like provision as to lands bid off by the State and held for five years, met with a like fate : *Groesbeck v. Seeley* 13 Mich. 342.

An attempt of the Legislature to make it certain that the grantee of a tax deed shall at least get his money back, has not been very successful: Laws of 1865, p. 575 ; How. Stat. § 1167 ; *Hart v. Henderson* 17 Mich. 220 ; *Robbins v. Barron* 32 Mich. 36 : 33 Mich. 124 ; *Weimer v. Sorter* 42 Mich. 569 ; *Ellsworth v. Freeman* 43 Mich. 488 ; and a statute providing that a tax deed shall be good if any portion of the tax is valid, is held so far void. *Silsbee v. Stockle* 44 Mich. 561.

I have cited these statutes and decisions, not to find fault with the latter, but to show the constant struggle which has been going on between the Legislature and this Court. The

Legislature has been impressed with the fact that if the State revenues are to be collected, some way must be found by which the land of delinquents can be sold and a good title given. The judiciary has consistently held that this can be done only when the requirements of the law as to the assessment and collection of taxes have been substantially followed, and that a tax sale is void if any illegal tax is included in the amount for which the sale was made. The result has been a growing belief in the invalidity of all tax titles, and as a consequence the inability of the State to sell delinquent lands for the amount of taxes due. The law has been that the State bid in all lands offered at tax sales, where bidders were not found to pay the amount of the lien. The lands thus bought, the State held for private as well as public sale for the amount of its lien. Great accumulations of lands in the hands of the State followed as a matter of course. Lands held by the State for five years were not thereafter subject to assessment until the State title had been sold. Afterwards provision was made that all State tax lands which had been held by the State five years, should be sold to the highest bidder without reference to their cost to the State : Laws of 1869, p. 367, sec. 124. The effect of this was that parties who had not paid their taxes for years, were enabled to buy in their lands at such sales for a trifle, and thus clear them from all tax liens. In consequence, in 1875, the provision authorizing such sales was repealed, and thereafter the accumulation of delinquent lands in the hands of the State went on increasing. The original owners of these lands were, as I am informed by Mr. Pratt, long the Deputy Auditor General, almost wholly non-residents. The statutes allowing the summary sale of the personal property of tax-payers, for taxes, were effective in compelling the general payment of taxes by residents. But as against non-residents, no remedy could exist except the sale of their lands. Non-resident owners have large bodies of land, especially in the northern parts of the State. Many of them soon learned the worthlessness of tax titles, when thoroughly contested. They had abundant means to make such contests. They deliberately determined not to pay these taxes and to take the chance of defeating all tax titles. Bidders at tax sales would not venture into a contest with such men, and left their lands to be bid in by the State. The owners permitted such sales, relying on their being able to clear the lands from all tax incumbrances when finally the State should be obliged to sell its tax lands to the highest bidder, irrespective of costs.

The conduct of non-resident owners of lands in Michigan has been the natural result of the tax laws of Michigan. Men of another state are not likely to pay taxes on property here unless compelled. They mean no public odium by refusal; their refusal has been often excused by the attempts of many townships to saddle on them more than their share of the public burdens. The result of the laws has been to make favorites of those whom nobody in the State wishes to favor. The State of Michigan has lost millions of dollars of taxes justly due from non-residents. The deficit thus resulting, has, of course, been made up by residents. Another result has been the direct favoring of the rich over the poor. A resident who lets his land be sold for taxes is usually a poor man; if not, the collector will make the taxes out of his personal property. Generally residents who do not pay their taxes are not only poor, but ignorant; they are the natural prey of tax-title speculators. When an ignorant and poor man learns that his homestead is claimed by a tax-title purchaser, under a title prima facie good, naturally his alarm is such that he is ready for almost any compromise, and if he goes to a competent lawyer, he is told that it is better to pay the speculator an enormous profit, rather than to stand a suit.

The evils which the State of Michigan has suffered from its tax system for many years are certainly worthy of the most serious consideration. It has lost millions of money justly due from wealthy non-residents. When, through the carelessness of its poor residents, these lands have been sold for taxes, it has taken the whole land to bring the taxes, and the owner, to redeem his land, has been obliged to pay an enormous profit to the speculator. Worst of all, perhaps, it has made a class of men absolutely essential to the collection of its revenue, purchasers of tax titles, ignominious, until the name of being engaged in buying tax titles is a disgrace. It has therefore driven from such purchases almost all men who are not naturally gamblers, and inclined to a business which involves great risks and chances.

The State of Michigan has been issuing innumerable deeds, which its officers know are in all probability worthless. It has been building up a class of speculators worse than those who gamble in stocks or in grain. All this it has done because it has given no assurances to purchasers at tax sales as to what they would get, and so made it a business which honorable men cannot pursue in an honorable way.

3. The third essential to a tax sale is, that a sale must be

public, and so as to secure as great competition as possible. In Michigan this sale has always been to the highest bidder, and notice of the sale has been given by the law which fixes the date on which each sale shall begin, and also by notice published in some paper of the county. The state of the law on this point seems adequate, though as I have heretofore pointed out, the expected competition has been defeated by the provisions for redemption.

4. The fourth essential is: The persons interested in the property to be sold must, so far as practicable, have notice of the sale so that they may protect their property.

No one would doubt the desirability of making such notice personal. Persons aware that their property is about to be sold for a small lien would be likely either to discharge the lien and so prevent a sale, or to make sure that there was such competition that only a small portion was sold. If they did not do this, they would not receive much sympathy on account of their loss of the property sold. But personal service of notice on non-residents would be impracticable. And personal notice to residents would be difficult and expensive. All the persons interested in a piece of land could be ascertained only from the records of the register's office of the county where the land lay. This would render necessary the getting of an abstract of title for every piece of land delinquent. This abstract would have to be perfected to the date of the sale. And such abstract would be imperfect evidence of the state of the title. It might show title in a person who was then dead. The expense of such an abstract would be in many cases several times the amount of the tax. It would, of course, have to be added to the tax, and so greatly increase the burden on the least unworthy class of delinquents, those who do not pay because of poverty. The expense of serving the notices would also be considerable, and it too would have to be added to the tax. And if the validity of the sale depended upon the fact that personal notice was given to all interested, this would add a new and great element of uncertainty in the purchase.

And these notices, in the great majority of cases, would be unnecessary. Men who have an interest in real property must be assumed to know that it is subject to taxation, and the time when the tax is payable. They are also, if residents, personally solicited by the collector to pay each tax assessed to them. They may also be assumed to know the day in the year on which lands are sold for taxes. They are very likely to see the notice of the sale, published in a paper of the county where the land lies.

For these reasons, notice of tax sales by publication in some paper has been deemed sufficient and universally practiced.

The difficulties connected with the sale of lands for delinquent taxes became so pressing that in January, 1881, both the incoming and retiring Governors referred to it in their messages. It was then ascertained that there was more than three millions of dollars due the State on the lands it had been compelled to take, for the want of other bidders. Governor Jerome recommended that a Tax Commission be appointed to revise all the tax laws. The Legislature adopted this recommendation and passed the act under which the Commission afterwards acted. (Laws of 1881, p. 146.) I am credibly informed that this step was taken with the approval of some of those then members of this Court, and that the act was drawn by one of them. I do not think that any suggestion of its unconstitutionality was made until the argument of the *Iron Cliffs* case. The members of the Commission were promptly appointed, and soon after began their work.

IV. *The Work of the Tax Commission.*—I was a member of that Commission, and deem it but justice to them and the Legislature who adopted their recommendations, to state the motives which led to the framing and adoption of those parts of the statute whose validity is now assailed. Much time was spent by the Commission, and many questions carefully considered, not involved in this suit, but we all felt that our most important work was to find some way in which owners of real estate, and especially non-resident owners, could be compelled to pay their share of the public burdens. We were told that many non-resident owners of large bodies of lands in the northern parts of the State, were systematically refusing to pay their taxes, and practically defying the State to collect them. We were familiar also with the attempts of previous Legislatures to remedy the difficulty, and their failures. The great question was to devise a statute, free from constitutional objections, which, without injustice or unnecessary hardship upon poor, or merely careless taxpayers, should compel the payment of all lawful taxes. I wish the members of this Court could stand in the exact position where the members of the Commission stood, and feel the motives which operated on them. Surely the evils under which the State had long suffered, demanded a remedy ; did they not ? It was not right that so large and increasing a proportion of the taxes should go uncollected. Something must be done. But what ? We early came to the conclusion

that previous Legislatures were right in feeling that somehow tax titles must be made good, or tax sales would not bring the needed revenue. As the ground on which tax titles have been held invalid is the non-compliance with the law by the assessing and collecting officers, the most obvious remedy would be to secure the due observance of the law in essentials, and make non-essentials immaterial. This last we sought to do in sections 84 and 85 of the Act as passed. But the former, the due observance even of essentials, by officers chosen as in Michigan, seemed to us beyond the power of any statute to secure. Some error sufficient to make a tax title invalid, we felt sure would creep into the great majority of taxes in spite of any care a law could secure. And any remedy which could come from increased care in the taxing officers, must be very gradual, and could be secured only by decisions of this Court holding tax titles valid in individual cases, and so removing the present general opinion of that invalidity. Such decisions in cases between a poor man and the speculator who had bought his homestead for a trifle, past experience made it impossible to expect. The judicial mind inspired by a desire to prevent what seems a great injustice, is microscopic in its power to see defects, and no attainable care in taxing officers can prevent the finding of defects sought under such circumstances. And such decisions, if given, would operate with great hardship upon many tax-payers, who, trusting to the general opinion of the value of tax titles, allowed their lands to be sold, and suddenly woke up to the fact that they were gone forever.

We abandoned, therefore, the hope of perfecting tax titles through a perfection of the preliminary proceedings. But one other course was left. The validity of the previous proceedings must be conclusively determined before the sale. How could the validity of such tax proceedings be so determined? There is but one way. There must be a suit brought by the State claiming a lien for the taxes assessed, and asking for an order of sale for such taxes as are held valid. To this suit all the persons interested in the land to be sold must be parties.

That the State has a lien on a piece of land for all unpaid taxes properly assessed will not be disputed. Nor did it occur to any member of the Tax Commission that there was doubt of the power of the Legislature to authorize the State to enforce its lien for taxes like that of a mechanic. Nor am I now able to see the least rational basis for such a doubt. It is certainly as important that a State should collect its revenues

as that a private person should collect his debts, and it ought to have at least equal powers for this purpose. But in the devising of a practical scheme by which the State could bring a suit for the enforcement of its liens against delinquent lands, many difficulties arose. It were easy to have avoided all the legal difficulties we then saw, by treating the tax lien like a mortgage, and authorizing the Auditor General to enforce it by a bill in chancery against each piece of delinquent land and all persons interested therein. And this seems to be the law in Missouri: Laws of Missouri, 1879, p. 1343, § 6839.

But the enormous expense of such a proceeding deterred us. The State would do better to give up the most of its tax claims than to incur such expense; and if the whole amount was put, as in justice it should be, upon the delinquent, his burden might be aggravated twenty-fold. But if there is no other legal way in which the validity of a tax lien can be determined before sale, then I should advise the Legislature to provide for a bill in chancery to enforce each tax lien. Anything is better than for the State to continue its past course of encouraging one of the worst forms of gambling.

It seemed to us, however, useless to file separate bills all in substance the same, against each piece of delinquent land. The substance of each bill could be nothing else than a statement that the State claimed that such an amount of taxes had been lawfully assessed against the land named. Nor did it occur to us that any judge could think it necessary to go back to the old doctrine that in seeking to establish a claim for taxes, it is necessary to prove the validity of each step taken in the previous tax proceedings. And if no such proof is to be required, surely no setting out of such steps is requisite. Nothing need be averred in any pleading which is not required to be proven. If it be in the power of the Legislature to provide that a tax deed is prima facie evidence of the validity of all proceedings, it must be in the same power to give a like effect to the return of taxes to the Auditor General. The expense of looking up each proceeding in every township and school district, involving the validity of some portion of a tax would be enormous, and must properly be charged upon the delinquent tax-payer. We adopted the plan of a joint petition against all delinquent lands, with simple general averments, because of its comparative inexpensiveness, and because we could not see that the rights of any tax-payer would suffer in consequence. As soon as a

tax-payer appeared and filed objections, the suit as to him would become general.

Every detail of the plan adopted was made after careful consideration of its practical working. The aim was to give the tax-payer complaining a cheap method of getting a tax illegal set aside, in whole or in part, as might be just, while the proceedings were made sufficiently summary to make sure that the business would be all finished before the day of sale.

The great difficulty which we saw was in bringing the parties interested into court, so as to make its decision final. We had no doubt that personal service was desirable. But we saw at once that it involved all the difficulties and all the expense which I have pointed out in considering the proper notice of a sale. Reluctantly, therefore, we gave it up. The only substitute was notice by publication. And here we had to consider its justice, and then the power of the Legislature to authorize a conclusive judgment on such notice. The question of justice concerns two classes, the first and most important, non-residents; the second, residents. It may be assumed that judicial proceedings to enforce liens against the land of non-residents, where notice is given only by publication, are both just and legal, since such proceedings have long been in force without objection in this and probably all other states in the Union, if not in every civilized country. Indeed, this is the only notice which is legal, since the courts of one state have no power to serve its process outside of the state. The question concerns then only residents, and of these only such as are able to escape the payment of their taxes because they have not personal property on which the collector can levy. And here I will compare the provisions of the new and the old law. What new hardship does our law impose upon such resident tax-payers? Here a distinction should be made between illegal and legal taxes. Our law gives to a tax-payer three different and inexpensive remedies against illegal taxes, which he did not have before. He may appeal from the judgment of the supervisor to that of the board of review upon the question of the amount for which he shall be assessed: Secs. 18 and 19. He may appeal to the board of supervisors against the validity of any tax proposed to be raised: Sec. 24. And lastly, he may file objections to the validity of any tax in court, and get a judicial decision thereon, and may, if he is beaten, take the case to the Supreme Court: Secs. 57 and 61.

The remedy to set aside illegal taxes not rejected by the

Auditor General, under the old law, was the expensive one of a bill in chancery to enjoin a threatened sale. The only other remedy was to let the land be sold and fight the tax title. This also was expensive, and spite of the usual worthlessness of tax titles, more risky than a prudent man would like to take.

It seems entirely plain that the law of 1882 is much better adapted than that which preceded it to do justice to a careful tax-payer, who wishes to pay all legal taxes and have all that are illegal set aside. As against legal taxes neither law gives any remedy, and under either the careless tax-payer will find his land sold. But under the law of 1882, the sale will be on such terms as to produce real competition, so that the tax-payer will be likely to lose but a small portion of his land, while under the previous law the whole was sure to go for the amount of the tax, however insignificant.

The considerations of objections to taxes will be likely to be much fairer under the law of 1882 than before. The stake will be only the amount of the tax, and not the whole of a valuable lot or farm. Justice will be administered, according to more fixed and practicable rules, when the only question is whether the State shall get a trifling tax or the tax-payer be relieved from its payment. And tax-payers will not, under the new law, seek to show trifling defects in the proceedings, which affect the amount of their taxes inconsiderably.

The only thing which the new law takes away from the careless tax-payer is the right, after two years or more of silence, to find defects in the taxes. The commissioners carefully considered the question whether this time might not safely be extended. There seemed no special justice in requiring a resident to pay his taxes at once under penalty of a sale of his personal property, and in giving a non-resident such a long time. But another consideration seemed more decisive. The value of many lands consists in a large part in their timber. If four or five years are given before sale, many tax-payers might cut off their timber and let their land be forfeited. Sometimes the right to object to illegality in tax proceedings must be cut off, or there can be no security in tax titles, and hence no competition at tax sales. It may be said that it is unjust that this should be done without personal notice to the tax-payer. The only object of personal notice is to let the tax-payer know that his lands will be sold if he does not pay the tax. And this is fairly done under the law of 1882. The collector is bound to demand the tax before he returns the land.

The board of supervisors may authorize further notice to be given (sec. 50), and this they will be likely to do if any injustice is found to come from their not doing it. The taxpayer himself must be supposed to know the taxes on any piece of land must be paid; he can, by a little inquiry, learn the day for the court proceedings and for the sale, if he does not see the published notice. There is scarce any danger that a moderately careful man will find his land sold, without the grossest carelessness; and no personal notice will correct the carelessness of the grossly careless. The law of 1882 may, if rigidly enforced, occasionally cause loss to some members of this class, but it is a loss not likely to be considerable, since competition will then prevent too great profit to the tax purchaser. But if such loss is necessary, it is demanded by the strongest necessities of public policy and must be borne.

The Commission gave a great deal of thought to the question, whether it is in the power of the Legislature to make a judgment against a piece of land conclusive evidence of the validity of the taxes against resident owners who have had no personal notice of the proceedings. If we had trusted to the personal views of the lawyers of the Commission, we should have looked into our Constitution, and finding there no prohibition, should have said unhesitatingly, there is no doubt of the power. But not feeling certain that this Court would look at the matter in the same light, we looked into the statutes of other states. We found that in Illinois a system of getting judgments against lands for taxes prior to sale has long existed, that service in such cases is by publication only, and that such judgments are conclusive as to all matters prior to judgment. Statutes of Illinois, 1880, pp. 899 and 907.

We found also a similar statute in Minnesota, with provisions making sales under the tax judgment conclusive evidence of title, with certain exceptions, not perhaps broader than are implied or expressed in the Tax Law of 1882: Statutes of Minnesota, 1878, pp. 230, 236. We found statutes somewhat similar in other states: Statutes of Nebraska, 1873, p. 940 et seq; Statutes of Nevada, vol. 2, p. 191 et seq; Statutes of Tennessee, 1871, vol. 1, § 612 et seq. We looked into Judge Cooley's work on Taxation, p. 357, where he discusses judicial sales for taxes, and into the decisions, and found no hint that any constitutional objection had been made to such judgments and sales. We tried to reason on the subject from first principles. We could not see why, if a court of admiralty, from custom and necessity could condemn a ship and sell it, so as to convey a perfect title, without personal ser-

vice on any owner, a sovereign state, untrammeled by constitutional prohibitions, might not authorize its courts to exercise like power. We thought, too, that if the law could authorize a sale of the lands of non-residents, without personal notice, because of the impracticability of such notice, a like impracticability, of which the Legislature would be the sole judges would justify such sales in the case of residents.

But, conscious of the uncertainty of our opinions upon questions of constitutional law, and feeling deeply the importance of the matter to the State, we thought it right to ask the opinions of the judges then members of this Court. A draft of a bill was prepared and printed, containing provisions for decree and sale, substantially, though not in detail, like those finally adopted. A copy was given to each judge with the request that he would examine it, and especially the judicial proceedings, and tell us whether in his judgment the bill was free from constitutional objection. No hesitation was expressed in answering these inquiries; each judge expressed his views freely. The opinions of three upheld the validity of the method of sale proposed; the fourth said he thought the proceeding would be more administrative than judicial; doubted the conclusiveness of the sale, but said he thought the decree could do no harm. Afterwards, when the bill came before the Legislature, these opinions of the judges were freely repeated to its members and their action was doubtless based in part thereon. I mention the matter here, not because such opinions are binding on any one, but to show the care which was taken by the Commission and the Legislature.

We called the court having charge of the judicial proceedings in the law of 1882, a court of chancery, and in this respect we did not follow the statutes of Illinois and Minnesota. We made this change because a court of chancery is here the common tribunal for the enforcement of liens by judicial sales, and because there is a great amount of law with reference to the course of proceedings, and especially the confirmation and setting aside of sales in foreclosure cases, which we wished to guide the court, without special enactment. None of us, however, thought that proceedings in a court of chancery were any less or more within the control of the Legislature than those of courts of law, nor that the validity of the judicial proceedings could in the least depend upon the name we gave the court in which they were to be enforced.

54 MICH.—28

V. *Constitutional Objections to the Tax Law of 1882.*—
It is very difficult to classify the objections made in Judge
Campbell's opinion, but substantially I think they are
included under the following heads. The language used is
my own:

1. That the whole law is void, because the Tax Commis-
sioners discussed the merits of the bill on the floor of the
legislative chambers, and all amendments offered were
referred to them.

2. That the Legislature has no power to authorize a court
of equity to entertain suits to enforce tax liens.

3. That the law does not provide for personal service on
parties interested in the land to be sold.

4. That it does not give defendants a right to a trial by
jury.

5. That there is no appeal from the decision of the cir-
cuit court on the admissibility of evidence.

6. That the petition of the Auditor General does not set
forth the grounds on which the alleged tax is valid.

7. That hundreds of defendants owning distinct pieces of
land are united in one suit.

8. That in case of non-appearance a decree is rendered for
the tax without proof, and the sales are confirmed in the same
way.

9. That the record of the proceedings is not kept in the
court of chancery.

10. That the law does not give the court any power of pre-
venting parties from being deprived of rights by accident,
ignorance or the misconduct of others.

11. That no provision is made for protecting the rights of
infants or insane persons.

1. The first objection is the only one which goes to the
whole law. If sustained, the statute and all proceedings
under it for the last three years are void, and the State has
no tax law, and no one is under legal obligation to contribute
to the support of its public institutions. If this objection is
untenable, the other objections refer wholly to the collection
of taxes by the sale of delinquent lands, and these may be
held invalid without such fatal consequences as must follow
if the whole law is held void.

It is therefore necessary to examine carefully the grounds
of this objection. It seems plain that it cannot rest on the
law permitting the commissioners to speak on the floor of
either house. If such law was unconstitutional, it was void
and bound no one. At the most it was a rule of procedure

which the Legislature could have changed at any time. If the tax law represented the will of the Legislature, expressed in constitutional form, its source can be of no consequence. It will not surely be claimed that if the law granting the commissioners the right to participate in the legislative dis- cussions had never been acted upon, the tax law would have been invalid on this account. The objection must then be, to what was actually done,—to the fact that the commis- sioners did on the floor of each house debate the tax law, and that amendments were referred to them.

And the objection must be, not to the fact that the action of the Legislature as to the whole or any portion of the law was influenced by the views presented in debate or reports by the Tax Commissioners. It is impossible that this Court should know what in fact influenced the members of the Legislature. Judge Campbell finds that so much of the statute "as brings in substantial innovations upon the old system," is to be traced to the influence of the Tax Commis- sioners in debate or in their action upon the amendments proposed. But the journals afford no evidence of such a fact. No amendment in either house was ever offered, which affected in any important particular the law as prepared by the Commission. No attempt was made to change the scheme for a judicial sale of delinquent lands, save in slight and immaterial points. The tax law was passed by very large majorities in each house. Surely this Court cannot assume that it would not have been passed, if the Commission had never been present at any of its sessions.

And if this Court could ascertain that some parts of the law would not have been enacted, except for the supposed improper work of the commissioners, this would be no ground for holding invalid the other parts of the law. The whole law should not be set aside for an evil influence found to affect only a part.

So far then, as the point under consideration bears against the whole law, it must be based on the fact that the commis- sioners debated the law in each house, and gave their views on amendments submitted. It must be claimed that an unlaw- ful influence was brought to bear on the Legislature, which rendered their action void. The general doctrine that the courts cannot inquire into the motives of legislators or the sources of their opinions is well settled: Cooley's Const. Limitations, 226 and note; *Lynn v. Polk* 8 Lea 121.

The proof that a bill was passed by bribery of a majority of both houses, does not render it void. It is not claimed

that the act is void, because passed through the influence of the Commission. The illegal thing is, that this influence was exerted in a particular way. It is not unlawful that a subject is referred to a commission, and they prepare a bill and strongly recommend its passage. It is not illegal that commissioners, or anybody else, lobby with each member, or go before committees to advocate the passage of a law.

It would seem that if a whole subject could be referred to a commission and they allowed to report a bill, and recommend its passage, the reference of amendments to such bill to the same commission cannot be unlawful. And if any one may lawfully advocate any pending measure before committees of either house, it is difficult to see why the same thing may not be done before a committee of the whole house. If not, at what point in the increase of the numbers of a committee does that which was legal become illegal?

If the subject is to be looked at from the stand-point of the result to be accomplished, the plan adopted in the act providing for the Tax Commission seems the best possible.

The Commission was appointed because it was thought that by giving more time to the subject they could prepare a draft of a better law than would be made by a committee of the Legislature. It was most important, that when such draft was submitted to the Legislature, the reasons which led to every clause should also appear, and that the Commissioners should be able to give their answer to every objection which might be suggested. The plan adopted accomplished the purpose. It is true that it gave the commissioners great influence, but it was a just influence; it was the influence which men who have devoted a long time to the examination of a subject, ought to have over fair-minded men, who are conscious that they have not an equal knowledge. It is said that the legislation in question was actually influenced by the intervention of the Commission. Very likely it was; it was for this end that the Commission was appointed; for this end that the Governor was requested to select "proper and discreet persons." The Commission was useless except to have an influence on the Legislature. The principle involved is one of very great public importance. As the State grows the complications of legislative questions will become greater and greater. The plan of referring difficult laws to a commission of experts for the fullest examination and report, is more and more desirable.

The usefulness of such commission cannot be fully secured except by bringing its members into direct contact with the

Legislature, and securing thereby the freest possible exchange of views. Allowing them to participate in legislative discussions is the best and perhaps the only way in which such exchange of views can be secured. No doubt the influence of such a commission is likely to be very great. But it is in its nature the best influence which can be brought to bear upon legislatures. It is the influence which ability and knowledge always give in every full and fair debate. As well might complaints be made of the influence of lawyers in arguing a case in this Court. It is the influence which courts and legislatures alike need as to every matter of importance before them.

When now a judge says that this influence, in its nature so desirable, is so contrary to constitutional law as to destroy any statute to which it may have contributed, we do well to earnestly inquire where he got this rule of the Constitution? And when no clause of the written constitution is referred to, and no decision of any court, we may well conclude that the judge is mistaken, and that unconsciously he has elevated one of his opinions into the dignity of a constitutional restriction.

2. The second objection is: The Legislature has no power to authorize a court of equity to entertain suits to enforce tax liens. This objection seems to me a fair inference from the language of Judge Campbell's opinion, though it is nowhere distinctly stated. It would seem that a court of law must be equally powerless. That seems to follow, from the claim that the collection of taxes must be administrative, and not judicial. The result is that the State must continue the practice of the past, sell lands to which it conveys no title, foster a race of gamblers more odious than gamblers in stocks or in wheat. It must continue a system, which experience shows to result in allowing wealthy non-residents to escape their taxes, while poor and careless residents have their homesteads sold for a trifle, because there is no competition at tax sales, and are able to redeem them only by paying the tax title speculator an enormous profit.

If there is a principle of constitutional law, which leads to these results, where is it to be found? Certainly not in any provisions of our written Constitution. Certainly not in the decisions of this or any other court.

3. The third objection is: The want of personal service. The desirability of such service, and the difficulties which make it almost impracticable, I have previously pointed out. But the mystery is to explain how it becomes a constitutional

question. There are a great many cases in England where courts of equity proceed without personal service on defendants : 1 Dan. Ch. Pr. 498–517.

And it is perfectly settled, not only in this State, but elsewhere, that service by publication is good in suits for the foreclosure of mortgages against non-residents, and against residents who are absent or concealed : 2 How. Stat. p. 1724. And there are other judicial proceedings which are binding on residents, though the only notice is by publication, as of the probate of a will: How. Stat. § 5801. The same is true of notice for the appointment of an administrator : How. Stat. § 5866. And persons who have claims against the estate of a person deceased, must prove them within the time fixed, though they have no personal notice : How. Stat. § 5889.

Nor is there any less hardship in losing rights in administrative proceedings, without personal notice, than in judicial, and in very many cases the statutes make such loss possible. It is unfortunate that any one should lose his rights to anything without personal notice. But the giving of such notice is, in many cases, so difficult and expensive, that a rule of law which dispenses with it is on the whole for the public good. The difficulty of giving personal notice in a given case, and the evils which will follow from the want of such notice, are questions of degree and of experience, peculiarly therefore for the Legislature to decide. And in the absence of a special constitutional restriction, it seems impossible to find any basis which can justify a court in interfering with the matter.

4. This fourth objection is: That the law of 1882 does not provide for a trial by jury. This claim is based on a provision of our written Constitution. Sec. 27 of art. vi, says: "The right of trial by jury shall remain." The utmost that can be claimed with any reason here, is that the right of trial by jury shall remain in those cases where it existed at the time the Constitution was adopted. But such right never existed in chancery cases: *Bellows v. Bellows* 58 N. H. 60; *Copp v. Henniker* 55 N. H. 210 ; *Middletown Savings Bank v. Bacharach* 46 Conn. 513; Sedgwick Const. & Stat. Law (2d ed.), 488, note. If, therefore, the Legislature may authorize the enforcement of a tax lien in chancery, they do not take away any right of jury trial which ever existed, and where, in the enforcement of a mechanic's lien in chancery, the Legislature authorized a jury trial, this Court held that a verdict was merely advisory and not binding: *Willard*

*v. Magoon* 30 Mich. 273; *Dunn v. Dunn* 11 Mich. 284.
A jury whose verdicts are merely advisory, is not the jury
which the Constitution intended to preserve. It is very strange
if the Legislature may authorize the enforcement of me-
chanics' liens without the intervention of a common-law jury,
and cannot do the same thing in behalf of the State for the
enforcement of tax liens. The case in *Tabor v. Cook* 15
Mich. 322, has no bearing, since their attempt was to enforce
a legal title by a bill in chancery, whereas the attempt here
is simply to collect a lien by the sale of so much of the land
as may be liable. And this case is an authority in point to
the effect that if the proceeding authorized by a statute is a
proceeding in chancery, there is no necessity of a jury trial.

5. The fifth objection is: That there is no appeal from the
decision of the circuit court on the admissibility of evidence.

In sustaining this objection, it is said that by our Constitu-
tion "the Supreme Court is given supervisory power over all
other courts."

If the deduction intended to be drawn from this provision
is, that every question of law must be in some form reviewable
in the Supreme Court, the principle is one of far reaching
importance, and should be announced in unmistakable lan-
guage. If sound, it must prevent all attempts to limit the
pressure of business upon this Court by limiting the right of
appeal to cases of a certain amount. That such a rule is con-
trary to many and harmonious decisions of this Court is
pointed out by Judge Cooley in his opinion in the *Iron Cliffs*
case. In addition to the decisions cited by him, I cite
*Maxfield v. Freeman* 39 Mich. 64; *Clark v. Raymond* 26
Mich. 415.

6. It is further objected by Judge Campbell, that the peti-
tion of the Auditor General does not set forth the grounds
on which the alleged tax is valid. This is a question of
pleading. It is not claimed that it does not inform the tax-
payer substantially what is claimed and what decree is sought.
The most elaborate statement which could be devised would
do no more than the simple petition provided by the statute
does. The petition, therefore, satisfies every requirement of
natural justice.

7. Another objection is: That hundreds of defendants
owning distinct pieces of land are united in one suit. This
objection is one of multifariousness. The doctrine of multi-
fariousness in chancery is based on the difficulties which
would arise if entirely different issues, having no relation to
each other, were sought to be settled in one suit. It is a

doctrine of convenience, and one where it is almost impossible to lay down general principles. But every difficulty as to multifariousness, according to the strictest chancery principles, in the carrying out of the law of 1882, vanishes the moment it is considered that with the appearance of each defendant, the suit becomes several as to him, and is henceforth conducted as distinctly as though from the first the proceedings were against him alone.

8. The eighth objection is: That in case of default, a decree is rendered without proof, and that sales are confirmed in the same way. The provision as to the decree is based on the presumption that no lands will be returned to the Auditor General as delinquent, unless they are so, and that the Auditor General will not advertise lands not returned as delinquent. Judge Cooley points out very clearly that this presumption is of the same kind which has existed and been approved by the courts of this State for forty years; and if it is now to be overthrown, and it is to be held that there is some unwritten constitutional provision which prevents the courts from enforcing any presumption authorized by the Legislature in favor of the validity of tax proceedings, all attempts to collect taxes may as well be given up.

It is important to notice that, under the law, the presumptions made against one who does not appear, are not conclusive. If a man has paid his taxes, or if his property is exempt, he may move to have the sale of his property set aside within one year after having personal notice of such sale: Sec. 64.

The same argument applies to the objection as to the confirmation of sales. It is presumed that the officer selling has done his duty, and when he returns the fact of the sale it is presumed that the sale has been according to law. Nor do I think that the report of a circuit court commissioner of a chancery sale affords any more security that the sale has been according to law, than the briefer report of the officer selling lands for taxes under the law of 1882. In either case, unless objections are made, the sale is confirmed, as a matter of course.

9. The ninth objection is: That the record of the proceedings is not kept in the court of chancery. Judge Campbell says, " The whole court action appears in the book entries and nowhere else." This statement is hardly accurate. The general decree against all lands, where no objection is sustained, is entered in the usual chancery records, though the description of the lands and amount of the tax

appear only by reference to the record book: Sec. 58. Special decrees are entered in full in the usual place for chancery decrees: Sec. 60. If experience should develop any difficulty in this method provided of keeping the records, it could easily be corrected.

It is impossible for me to understand how any constitutional question is involved, how especially there can be any unwritten provisions of constitutional law which require the records of a court of chancery to be kept in one place rather than another.

10. The tenth objection is: That the law does not give the court any power of relieving parties from the consequences of accident, ignorance or the misconduct of others. Section 62 provides: "The proceedings, where the validity of any tax is in dispute shall, where no other provision is made herein, follow the ordinary chancery practice, and the court may allow amendments as in ordinary cases." In section 64 is this provision: "The practice with reference to setting aside such sale shall be the same, so far as applicable, as in a sale in equity on the foreclosure of mortgages: Provided no sale shall be set aside for inadequacy of price, except upon payment of amount bid upon such sale with interest and costs." It seems to me that these provisions give a court power to relieve against accidents, etc. Indeed there seems very little limitation in the law upon the ordinary powers of a court of chancery; and when the tax has been paid or the property is exempt the sale may be set aside years after its confirmation: Sec. 64.

11. The last objection is: That no provision is made for protecting the rights of infants or insane persons.

It would be desirable if guardians could be appointed for infants and insane persons in the proceedings for judicial sale under the law of 1882. But if this were done, it would not only be necessary to ascertain the owner of every piece of land, but also their ages and mental condition at the time when the proceedings were begun. To do this, if practicable, would entail a great expense upon every description advertised. The appointment of guardians, when necessary, would make an additional expense; and such guardians, when appointed, could in the great mass of cases do nothing for their wards. In ninety-nine cases out of one hundred, it would cost far more to ascertain any defects in the tax proceedings than the deduction which would be made in consequence.

Then generally where persons not able to attend to their

own business have property, they have guardians whose duty it is to pay the taxes, and who are liable if they do not pay them. The hardship of selling the property of persons under age, or non compos, for taxes without the appointment of guardians, is much more theoretical than real; it has always existed under the tax laws of this State, and yet no complaint has been made. I find no decisions which make the appointment of such guardians in judicial proceedings a constitutional question. It seems like the question as to service of persons of full age by publication, one of conflicting evils and entirely within the discretion of the Legislature.

For a fuller and abler discussion of some of the constitutional questions involved, I refer to Judge Cooley's opinion in the *Iron Cliffs* case.

VI. *The Effect of the Iron Cliffs Case.*—In that case the decision of the court below in favor of the constitutionality of the law of 1882 was affirmed by an equal division of this Court. So far as the parties to that case are concerned, the judgment was conclusive : *Lyon v. Ingham Circuit Judge,* 37 Mich. 377, and authorities there cited. The question is as to the effect of that case upon the decisions of all inferior tribunals. This question is one of propriety and public policy rather than strict law.

It may be said that an unconstitutional law is no law, and that therefore anybody may treat it as void, running the risk of the consequences if his view is not sustained by the courts. Even if this is true, considerations of modesty ought to affect the decisions of all inferior tribunals. In *Ortman v. Greenman* 4 Mich. 294, this Court comments with severity upon the action of a justice of the peace, in presuming to hold void an act of the Legislature. And the general doctrine has been, so far as a doctrine can be shown by practice, that a circuit judge should not presume to sit on the validity of an act of the Legislature, but should leave such questions to be settled by the Supreme Court. There is of course a presumption in favor of the validity of every statute. One co-ordinate branch of the government has, in the course of its duty, examined the question, and in passing a statute has held it valid. Modesty should forbid any inferior tribunal from setting aside this presumption. It should certainly forbid any single judge of such a tribunal from trusting to his own opinion against the views of large majorities in the Legislature, many of whose members may be his equal in ability and knowledge of constitutional law.

The fact that an argument has been had in this Court, and

its members are equally divided, is a reason for not setting aside but for strengthening this rule. If the highest court of the State is unable to hold an act unconstitutional, surely no inferior judge should take upon himself that great responsibility. What presumption in him to put his opinion, not merely against that of the Legislature and the Executive, but against that of half this Court!

Considerations of public policy of great importance unite with those of modesty to prevent an inferior court from holding a statute invalid, which this Court after full consideration is unable to set aside. It is of the greatest consequence that the law of the State should be uniform, that one rule should be applied in every county. Especially is this true of the law for the collection of the public revenue. If taxation is not uniform, if men in every part of the State are not obliged to pay their due proportion, the feeling of injustice will be very great.

There is no way in which this uniformity can be obtained, no way to prevent one county from escaping taxation while another is compelled to pay its taxes, except by the adoption of a rule that no inferior court shall be allowed to set aside an act of the Legislature upon the validity of which this Court is equally divided. It seems to me then the plain duty of this Court, if the opinions of the judges remain unchanged by this argument, to reverse the decision of the court below and grant the decree asked for by the Auditor General.

So only can the State escape that utter confusion and injustice which must follow from having a law for the collection of the revenue valid in some counties, and invalid in others.

The court below ought at all events to have granted the decree asked, where there was no appearance.

The decree dismissed the petition wholly, and not merely as to Campau. It can be justified only on the ground that it is the duty of a court of its own motion to refuse to execute a law it deems unconstitutional, and not to wait until objection is made by a party interested. This is a very dangerous doctrine, especially as applied to inferior tribunals, and contrary to the well settled rule on the subject: Cooley's Const. Lim. (4th ed.), p. 199 et seq.

The judge of the court below, on the application of a taxpayer, whose interest in the matter was trifling, and on an argument in behalf of the public by a young man utterly unknown, presumed to decide that so far as Wayne county is concerned, the State should no longer collect the revenues

necessary to its existence.   Such presumption in an inferior tribunal ought to be rebuked.

The great importance of the questions at issue must be my excuse for presenting a brief so long.   I have felt a great sense of responsibility to the State in its preparation.   A very much greater responsibility now falls upon this Court. Very great interests depend upon the decision.   I submit that the decree of the court below must be set aside, and such a decree entered as is sought by the Auditor General.

COOLEY, C. J.   When the case of the Iron Cliffs Company was decided, I assumed—unwarrantably, it seems—that the judgment, though rendered by a divided court, would be accepted by the circuit judges as law and followed by this Court as a precedent, until it should be overruled by a majority of this Court.   I have always supposed that was the proper course, and it seemed to me a course so necessary to a dignified and orderly administration of justice, that it never would have occurred to me that any other could be taken.   Such a division of the Court is liable to occur at any time; and there are so many cases in which, by reason of interest, consanguinity or former connection with the controversy, some one judge is disqualified from sitting, that there would be constant liability to an equal division if the Court consisted of an unequal number.   If, therefore, a decision made may be disregarded by a circuit judge because not made by a majority, we have and can have no settled law for the State at large, and each circuit judge will determine for himself conclusively what shall be the law for his circuit, and may make it different from the law of the adjoining circuit.   This would so much resemble a judicial scandal that I should deem it my duty to prevent it by yielding my own opinion when the same question should come up again, if yielding should be essential to prevent such a consequence.   The notion that there can be anything improper or opposed to good morals in a judge yielding his opinion when a proper administration of justice requires it, is one I do not quite understand.   Judges are certainly doing that every day: it would be a great mistake to assume that every

judgment in which a court unites, expressed in all respects the views of every concurring judge.

In this particular case the reasons for abiding by the first judgment are peculiarly strong, because the case is substantially the same. The State proceeds in each county separately to obtain an order of sale : if one proceeding had been provided for instead of several—as might have been done but for reasons of convenience—the doctrine of res adjudicata would unquestionably apply.

I have no inclination to go again into an examination of the legal questions. I have read with interest the opinion of my brother Campbell herewith filed, but I cannot see how it strengthens his former opinion. Much that my brother Sherwood says on the constitutional question I do not concur in, for the reason that it is distinctly opposed to the current of authority—and I may say to the almost unanimous consent of authority. The intervention of the judiciary in tax proceedings is provided for in many States, and is had and has been had for a great many years without question. I shall take the liberty of adding a reference to cases in a note to this.[1]

[1] Note. The following is far from being a complete list of the cases referred to, but it is sufficient for the purposes of this note: *Hogins v. Brashears* 13 Ark. 242; *Merrick v. Hutt* 15 Ark. 331; *Patrick v. Davis* 15 Ark. 366; *Gossett v. Kent* 19 Ark. 603; *Wallace v. Brown* 22 Ark. 118; *McDermott v. Scully* 27 Ark. 226; *Mayo v. Ah Loy* 32 Cal. 477; *Wetherbee v. Dunn* 32 Cal. 106; *People v. Doe* 36 Cal. 220; *Reiley v. Lancaster* 39 Cal. 354; *Ertel v. Foote* 39 Cal. 439; *Mayo v. Foley* 40 Cal. 281; *People v. Shimmins* 42 Cal. 121; *Reeve v. Kennedy* 43 Cal. 643; *Jones v. Gillis* 45 Cal. 541; *Stokes v. Geddes* 46 Cal. 17; *Mayo v. Haynie* 50 Cal. 71; *Carpenter v. Gann* 51 Cal. 193; *Harper v. Rowe* 53 Cal. 233 and 55 Cal. 132: *Reclamation Dist. v. Evans* 61 Cal. 104; *Atkins v. Hinman* 7 Ill. 437; *Young v. Thompson* 14 Ill. 380; *Pitkin v. Yaw* 13 Ill 251; *Dunham v. Chicago* 55 Ill. 357; *Hills v. Chicago* 60 Ill. 86; *Otis v. Chicago* 62 Ill. 299; *Durham v. People* 67 Ill. 414; *People v. Otis* 74 Ill. 384; *Chiniquy v. People* 78 Ill. 570; *Thatcher v. People* 79 Ill. 597; *Mix v. People* 81 Ill. 118; *People v. Owners of Lands* 82 Ill. 408; *Prout v. People* 83 Ill. 154; *Beers v. People* 83 Ill. 488; *People v. Sherman* 83 Ill. 165; *Chicago & N. W. Railway Co. v. People ex rel. Miller* 83 Ill. 467; *Hess v. People* 84 Ill. 247; *Andrews v. People* 84 Ill. 28; *Pike v. People* 84 Ill. 80; *Weston v. People* 84 Ill. 284; *Fisher v. People* 84 Ill. 491; *Mix v. People* 86 Ill. 312; *Hale v. People* 87 Ill. 72; *Law v. People* 87 Ill. 388-9; *Graceland Cem. Co. v. People* 92 Ill. 619, 620; *Belleville Nail Co. v. People* 98 Ill. 399; *People v. Dragstran* 100 Ill. 286; *Gage v. Bailey* 102 Ill. 11; *Mann v. People* 102 Ill. 346; *Gage v. Parker* 103 Ill. 528; *Douthett v. Kettle* 104 Ill. 356; *Frew v. Taylor* 106 Ill. 159; *Mix v. People* 106 Ill. 425; *Eagan v. Connelly* 107 Ill. 458; *Smith v. Hutchinson* 108 Ill. 662; *Parsons v. Gaslight Co.* 108 Ill. 380; *Stamposki v. Stanley* 109 Ill. 210; *Noble v. State* 1 Greene (Ia.) 325; *Scott v. Babcock* 3

When my brother Sherwood says that due process of law " can never be made to mean less than the prosecution of a suit in our courts according to the prescribed and well-settled rules of practice for the purpose of establishing some right or determining the title to or the value of property ; and no person can be deprived of his property against his will without it," he lays down a principle which is entirely proper in judicial proceedings, and which might be applied and enforced under this statute, but which has always been held entirely inapplicable in ordinary tax proceedings. Appealing to that principle, therefore, seems to me to be attacking his own general views as applied in this case.

Personally I have little care how this case shall be decided ; but it seems to me that on constitutional questions the Court

Greene (Ia.) 133; *Williams v. Gleason* 5 Ia. 284; *Bleidorn v. Abel* 6 Ia. 5; *Gaylord v. Scarff* 6 Ia. 179; *Detler v. State* 4 Blackf. 258; *Williams v. State* 6 Blackf. 36; *Pritchard v. Com'rs* 26 Kan. 584; *New Orleans v. Gottschalk* 11 La. Ann. 69; *New Orleans v. Jeter* 13 La. Ann. 509; *New Orleans v. Fisk* 14 La. Ann. 862; *Daily v. Newman* 14 La. Ann. 580; *New Orleans v. Heirs de St. Romes* 28 La. Ann. 17; *Irwin v. New Orleans* 28 La. Ann. 670; *Lavergne v. New Orleans* 28 La. Ann. 677; *Howell v. New Orleans* 28 La. Ann. 681; *Elder v. New Orleans* 31 La. Ann. 500; *Carter v. New Orleans* 33 La. Ann. 816; *Roberts v. Zansler* 34 La. Ann. 205; *Ex Parte Tax Sale &c* 42 Md. 196–7; *Guisebert v. Etchison* 51 Md. 478; *Steuart v. Meyer* 54 Md. 454; *Margraff v. Cunningham's Heirs* 57 Md. 585; *Com'rs v. Morrison* 22 Minn. 178; *Com'rs &c v. Nettleton* 22 Minn. 356; *State v. Jones* 24 Minn. 86; *County of Stearns v. Smith* 25 Minn. 131; *Aitkin Co. Com'rs v. Morrison* 25 Minn. 298; *Tidd v. Rines* 26 Minn. 201; *Keith v. Hayden* 26 Minn. 212; *Eastman v. Linn* 26 Minn. 215; *County of Chicago v. Railway Co.* 27 Minn. 109; *County of Washington v. German Bank* 28 Minn. 360; *Bower v. O'Donnall* 29 Minn. 135; *Everett v. Boyington* 29 Minn. 264; *Gilman v. Van Brunt* 29 Minn. 270; *Sanborn v. Cooper* 31 Minn. 307; *Kipp v. Dawson* 31 Minn. 373; *Stewart v. Colter* 31 Minn. 385; *Gutzwiller v. Crowe* 32 Minn. 70; *Coffin v. Estes* 32 Minn. 367; *Strassheim v. Jerman* 56 Mo. 105; *Carlin v. Cavender* 56 Mo. 286; *St Louis v. Bressler* 56 Mo. 350; *State v. Van Every* 75 Mo. 530; *State v. Sargeant* 76 Mo. 557; *Ewart v. Davis* 76 Mo. 129; *Raley v. Guinn* 76 Mo. 263; *Kansas City v. Railroad Co.* 77 Mo. 180; *Matter of 4th Ave.* 3 Wend. 452; *Matter of Albany St.* 11 Wend. 149; *Matter of 26th St.* 12 Wend. 203; *Matter of Furman St.* 17 Wend. 649; *Matter of Livingston St.* 18 Wend. 556; *Matter of Degraw St.* 18 Wend. 568; *Matter of Pearl St.* 19 Wend. 651; *Matter of John and Cherry Sts.* 19 Wend. 659; *Matter of William and Anthony Sts.* 19 Wend. 678; *Matter of Dover St.* 1 Cow. 74; *Striker v. Kelly* 7 Hill 9 and 2 Den. 323; *Embury v. Connor* 3 N. Y. 511, 523; *Matter of Broadway* 49 N. Y. 150; *Matter of Canal and Walker Sts.* 12 N. Y. 406; *King v. Mayor of New York* 36 N. Y. 182; *Rennick v. Wallace* 8 Ohio 539; *Wilkins' Lessee v. Huse* 9 Ohio 154; *Lessee of Barger v. Jackson* 9 Ohio 164; *Wilkins v. Huse* 10 Ohio 140; *Northrop v. Devore* 11 Ohio 359; *Therenin v. Lessee of Slocum* 16 Ohio 519; *Hess v. Potts* 32 Penn. St. 407; *Crandall v. James* 6 R. I. 144; *Perry v.*

is drifting to this position: That those statutes are constitutional which suit us, and those are void which do not. My own views of the proper distinctions between legislative and judicial authority do not permit of my concurring.

CHAMPLIN, J. I concur in the foregoing.

CAMPBELL, J. As I stated my reasons for holding the proceedings in the circuit courts under the Tax Law of 1882 invalid in the case of *Iron Cliffs Mining Co. v. The State of Michigan,* I do not deem it necessary upon the present controversy, which involves no different considerations, to repeat them. The argument, except on the direct constitutional questions, was chiefly aimed at impugning the propriety of declaring laws unconstitutional where there is any serious

*Brinton* 13 Penn. St. 202; *Campbell v. M'Iver* 4 Hayw. 62; *M'Carrol's Lessee v. Weeks* 5 Hayw. 246; *Francis' Lessee v. Washburn* 5 Hayw. 294; *Tharp v. Hart* 2 Sneed 569; *Thacker Ex Parte &c.* 3 Sneed 344; *Williams v. Harris* 4 Sneed 332; *Henderson v. Staritt* 4 Sneed 470; *Hightower v. Freedle* 5 Sneed 313; *Glass v. White* 5 Sneed 476; *Randolph v. Metcalf* 6 Cold. 400; *Quinby & Co. v. N. Am. Coal & Co.* 2 Heisk. 596; *Anderson v. Patton* 1. Humph. 369; *Hamilton v. Burum* 3 Yerg. 355; *Anderson v. Williams* 10 Yerg. 234; *Bush v. Williams* Cooke 360; *Thomas v. Lawrence* 2 Baxter 415; *Douglass v. Mumford* 7 Baxter 415; *Nance v. Hopkins* 10 Lea 508; *Houston & Ry. v. State* 39 Tex. 149; *Clegg v. State* 42 Tex. 605; *Morrison v. Loftin* 44 Tex. 16: *Morrison v. Chandler* 44 Tex. 24; *Belden v. State* 46 Tex. 103; *Edmonson v. Galveston* 53 Tex. 157; *Burns v. Ledbetter* 54 Tex. 374; *M'Clung v. Ross* 5 Wheat. 116; *Thatcher v. Powell* 6 Wheat. 119; *Woods v. Freeman* 1 Wall. 398; *Little v. Herndon* 16 Wall. 20; *Chicago Seminary v. Gage* 12 Fed. Rep. 398; *Davidson v. New Orleans* 96 U. S. 99; *Hagar v. Reclamation Dist.* 111. U. S. 701.

In *Davidson v. New Orleans* 96 U. S. 97, 105. Mr. Justice Miller says: "it is not possible to hold that a party has, without due process of law, been deprived of his property, where, as regards the issues affecting it, he has, by the laws of the State, a fair trial in a court of justice, according to the modes of proceeding applicable to such a case. This was clearly stated by this court, speaking by the Chief Justice, in *Kennard v. Morgan* 92 U. S. 480, and in substance repeated at the present term in *McMillen v. Anderson* (95 id. 37).

"This proposition covers the present case. Before the assessment could be collected, or become effectual, the statute required that the tableau of assessments should be filed in the proper District Court of the State; that personal service of notice, with reasonable time to object, should be served on all owners who were known and within reach of process, and due advertisement made as to those who were unknown. or could not be found. This was complied with; and the party complaining here appeared, and had a full and fair hearing in the court of the first instance, and afterwards in the Supreme Court. If this be not due process of law, then the words can have no definite meaning as used in the Constitution."

difference of opinion in courts or among judges. But as every judge is sworn to support the Constitution and nothing else, and as his duty to support the statutes must therefore depend on their conformity to the Constitution, I do not think, at this late day in American jurisprudence, that any judge is called upon to vindicate or explain his right or duty to decide such questions as on his official responsibility he is satisfied they should be decided. Whatever care is required of him in forming his conclusions, he is bound to act upon them when formed.

Neither is it true that any of the questions presented can be regarded as new. The division between judicial and administrative functions is radical and is found defined more or less clearly in all systems of jurisprudence. Powers that have been exercised since the beginning of the government by executive functionaries cannot be regarded as judicial; and under our Constitution, which expressly confines the judicial power to courts which are designated, and forbids each department to exercise any functions of the others except in the few specifically named cases, courts cannot become executive agencies. And if attempts are made to put controversies in the way of judicial decision, it must be by due process of law, which, when applied to courts, compels them to confine their action to cases where the methods conform to the settled principles of jurisprudence. I have previously given my reasons for the conviction that this proceeding is not due process of law, either executive or judicial. If the judgment here is held not conclusive, then it is in law no judgment at all, and leaves the court precisely where the Auditor General was left before. Finality is the clear object of the change. The action of the Supreme Court of the United States in refusing to treat the Court of Claims as a judicial body until its judgments were made final, is an illustration of this principle.

As parties on both sides, in the former controversy and in this, did not deny the power of the Legislature to employ commissioners to draft single laws, I did not then and will not now discuss that question, and it has been done on two

or three occasions which have not been questioned, and are not likely to be. The question is under this law, and the law providing for the Commission, whether commissioners can be allowed to intervene in the actual work of legislation. That they have done so, in the most important functions of both bodies of the Legislature, I have endeavored to show heretofore and do not propose to discuss again. But it seems to be assumed by counsel that the objections to such private interference with legislation by commissions are novel.[1] Upon this matter it may not be out of place to refer to the legal history of the State, which indicates, on all of the questions involved here, more foresight than is now supposed to have existed.

The Constitution of 1835 contained no limitation on the number or quality of the courts which the Legislature might establish, and the full judicial power over certain classes of subjects was vested in some persons and bodies which, under our decisions, could not now be allowed to exercise it. The Legis-

---

[1] The Honorable *Nathaniel A. Earle*, a representative from Kent county in the Legislature at its extra session held in 1882 to consider the report of the Tax Commission, raised a point of order pending the vote upon the passage on its third reading, of House Bill No. 2, which bill was to repeal Comp. L. § 2527, prescribing the annual tax on street railway companies, and had been introduced by the message of the Governor as the work of the Tax Commission, "against the House at this time taking any action as to the bill in question, his objection to further action being that the bill had never been properly introduced into the House; that neither a member nor committee of either House of the Legislature had presented this bill; that by the Constitution of this State and the rules of the House, a definite method was provided for the introduction of bills; that the method had been entirely ignored, and that all future action had upon the bill will be entirely unauthorized; therefore the bill had no legal standing in the House."

The Speaker (the Honorable *Seth C. Moffat* of Grand Traverse), ruled "that the point of objection was not well taken; that under the law creating the Tax Commission, the bill, with several others, came from the Governor, as the work of such Commission; that the bill entered the House, with others, by special message opening this session; that the objection raised might be a question for the consideration of the House, but it was not an objection which could be sustained at this time by the presiding officer. Whatever opinion might be entertained upon the subject, the objection could be easily cured by deferring further action until the formal introduction by some member."

Mr. *Earle* appealed from the ruling of the chair.

\*     \*     \*     \*     \*     \*     \*

The judgment of the chair was sustained.

*House Journal, 1882*, pp. 139, 140.

lature, as one of its earliest acts in the spring of 1836, before the judicial department of the State had gone into operation, and when the government was still imperfect, appointed Judge Fletcher, who had previously compiled the territorial laws, to prepare and arrange a code of laws for the State and report to the Legislature. Instead of a compilation, which it appears was all that the Legislature intended (see preface to Rev. St. 1838), he prepared a new and what was meant to be a complete Code, in separate chapters, whereby the law on several subjects was essentially revolutionized. Before the Legislature had acted upon it, some important matters were found to have been entirely overlooked, and the commissioner was given further time to report. An adjourned session was held in the spring of 1837, chiefly for the purpose of examining the chapters submitted, when it was found further omissions existed, which were mostly attempted to be supplied immediately by new reference and direction. At that session, after examination by the Legislature, the various chapters were adopted with some amendments, and two commissioners were appointed to arrange them under proper titles and publish them. Before those commissioners finished their task, some further omitted chapters were adopted and included by a new Legislature, and the Revised Statutes went into operation on the first day of August, 1838. Before the session of January, 1839, so many further omissions and defects were discovered that much of the time of the Legislature was spent in changing the Code, in some things radically and completely (as in the case of imprisonment for debt, where the reviser had not carried out the intent of his instructions), and in some supplying defects less extensive but not less serious. From that time until 1846 no session passed without a large amount of such amendment.

In March, 1844, the judges of the Supreme Court and the Chancellor were directed to appoint a commissioner learned in the law to consolidate and revise the general laws, who was to be united with the Chancellor and the presiding judge of the First circuit in a council of revision, and the result, as agreed upon by the council, was to be reported to the Legisla-

ture. This report, which was chiefly the work of the able
jurist who now presides over the Eighteenth judicial circuit,
was reported to the Legislature of 1846, and left their hands
very considerably modified, and in some parts changed alto-
gether. This system, both as reported and as modified, intro-
duced some radical changes, and the amendments rendered
it more or less incongruous. It, however, like the Revision
of 1838, superseded the great body of general laws on most
subjects, and was intended to be a complete code. It did not
escape the same fate of numerous changes in subsequent
legislatures, although it was not found to require the same
supply of original omissions. Nevertheless the confusion
created by all this changing action was one of the chief
causes of calling the Constitutional Convention of 1850, and
among the things urged upon that body as important were
the condition of the tax laws and the methods of legislation.
Upon the former subject a number of efforts were made to
give conclusive effect to tax proceedings and sales, and in
every instance the propositions were rejected as illegal as
well as arbitrary appropriations of private property. The
difficulties of collecting land taxes were similar to those now
asserted, and very much more serious in proportion. No
argument has been put forth recently in favor of extreme
measures which was not then used quite as strenuously. But
it was not deemed wise to attempt to take away absolutely
entire estates by summary and absolute forfeiture, without
inquiry being left open into the legality of the confiscation.
During the same convention a number of propositions were
presented for the appointment of commissioners to prepare
both general and topical revisions and codifications of all the
laws, and of the law on certain subjects. It was further pro-
posed to have commissioners appointed to compare existing
laws with the new Constitution, and report the result to the
Legislature. All of these were rejected by very decisive
votes, and all of the objections made were based on the mis-
chief of allowing laws to be changed except by the sole
action of the Legislature, which, it was urged, could not be
and had not been applied with full intelligence to extended

schemes which reflected the minds of others, and could not, on their passage, be thoroughly compared and digested by the body of legislators so as to enable them to realize their full effect on the whole legal system of the State. And the result was that the Constitution was made to contain a provision, not only forever forbidding any general revision of the laws, but also requiring compilations to introduce no changes whatever in the statutes, and to be made and certified under adequate security against them. Article 18, § 15.

Several other articles were adopted, the general purpose of which was to make laws short and intelligible, and to prevent the passage of any act without having its meaning clearly and directly brought repeatedly to the attention of every member.

It cannot be said that the constitutional convention did not mean the Legislature to be protected against the substitution of the judgment of others for their own, and did not feel the danger of it. And if ever the preparation of bills in advance by legislative sanction is not forbidden, it is only because the language used applies to a general and not to a partial revision. But this omission does not leave the door open to the introduction into the actual work of legislation of a participation by persons not members, and not selected by any constituency for that purpose, and still less for admitting advocates on one side, with important authority in the direction of business, without making provision for having the other side represented or defended by any one.

The only previous instances in which such commissions have heretofore been created, are the Constitutional Commission of 1873, and the revision of the laws concerning cities and villages. In both cases very eminent men were chosen. The power to allow such action concerning the Constitution was not generally acquiesced in, and the popular sense rejected the whole scheme. The Village Law was found open to constitutional objections which did not occur to its distinguished compiler. And the experience of many years has shown that the voluminous city and village charters of which our statute books are full, have almost always been adopted by

the Legislature on the faith of those who drew them, and have almost as uniformly turned out to be discordant and unwise in many of their provisions, and in many cases either unconstitutional or impracticable in execution. The propounders of new schemes have not kept in mind the necessity of making legislation harmonious either with other laws or with the Constitution, and have honestly in their zeal magnified benefits and failed to appreciate difficulties, which are not always on the surface, and will not occur to the minds of any but unprejudiced observers. These difficulties are not necessarily fatal obstacles to the existence of power to act, but they bear very strongly on the impropriety of treating an excess of power as frivolous and immaterial. I have said in my former opinion all that I care to say upon the power of receiving the commissioners into the full privileges of debate and consultation, and into a considerable control of the course of business of the two houses which represent here the principal functions of the ancient Parliament which derived its name from its debates and not from its laws, and was never very active in changing the laws, but inflexibly excluded outside interference as a breach of privilege.

I am of opinion that the decree dismissing the proceeding should be affirmed.

SHERWOOD, J. I am not insensible of the great and important interests, both public and private, to be affected by the final disposition of this case, and I believe I fully appreciate the serious consequences which may, possibly, finally follow an equal division of the members of this Court upon the question of the constitutionality of our general tax law presented in this issue. However much it is to be regretted that a decision by a majority of the Court cannot be made, still I cannot escape the conviction that it is my duty as a member of this Court, in this case as in every other, to act in accordance with the best understanding I can get of the question involved, uninfluenced by considerations of expediency or of policy. Entertaining these views, and having once passed judgment upon the questions presented,

it is perhaps needless for me to say that I listened with intense interest to the able arguments so forcibly presented by the distinguished counsel on their review of the question upon the hearing of this case. And after having again given to the subject the most careful and thorough consideration of which I am capable, I am compelled to say that I am unable to arrive at any other or different conclusion than was expressed by my brother Campbell in the *Iron Cliffs* case, and to which I gave my assent. It is not my purpose now to enter into any re-discussion of the general question so ably treated in the opinion filed by him in that case.

There are certain great natural rights which are fundamental and pertain to every citizen in this country. One of these is the right to private property. The people have always been very vigilant in protecting these rights. Fearing that in some way or in some manner they might be impaired or infringed under one pretense or another in after generations, the fathers of our system of government, in making the organic laws of state and nation, secured the continued existence of these rights by express provisions in their Constitution. For the protection and enforcement of these rights courts were instituted, both of law and equity. When the court of law failed, in consequence of the rigid rules by which it was governed, to furnish the proper means of protection or redress, just at that point equity took cognizance of the matter under the flexible power exercised in that court, and the manner of exercising it which is found in the practice of these courts, which, under the various statutes adopted for that purpose, have long been well settled, and are older by far than the constitutions themselves. And these means of enforcement and protection of these elementary rights are what is called "due process of law." It can never be made to mean less than the prosecution of a suit in our courts according to the prescribed and well-settled rules of practice, for the purpose of establishing some right or determining the title to or value of property, and no person can be deprived of his property against his will without it. Such due process of law requires a person,

when his property is sought to be taken from him in a court of law or equity, to be personally notified in some manner, if he is within the jurisdiction of the court, of the proceedings taken or about to be taken for that purpose. This law seeks, by a proceeding in a court of equity, to finally and conclusively, and without any opportunity for review, deprive the citizen of his property, he being within the jurisdiction of the court, and it may be living on the very property intended to be taken, without giving him any personal notice of the pendency of the suit. I regard this proceeding, as authorized by this law, not only a clear violation of the provisions of our constitutions, both state and national, but of the elementary principles upon which these provisions are founded. Here I leave this point, and should not have alluded to it only that some of my brethren did not regard the question of personal notice as properly raised upon the record in the *Iron Cliffs* case, and therefore declined to discuss it.

The other ground upon which I place my objection to the constitutionality of this law has been so well and ably discussed by my brother Campbell that I do not feel called upon to give it further attention. I am clearly of the opinion, however, that the manner in which the law was made was not only in conflict with the letter but the spirit of article 4 of our Constitution. The people are required to elect the persons whom they wish to make our laws, and they have fixed the number which shall compose each branch of the Legislature for that purpose. The Constitution gives the Legislature no power to select others, nor to authorize the Governor of the State to select others, to take seats upon the floor of each house and participate in the most important parts of legislation. It requires no peculiar sagacity to discover that such a commission with such privileges, composed of five of our ablest and most learned and influential citizens, would completely control the legislation of our State in very many cases and upon most important subjects. No one doubts, I apprehend, that such was the object and intention in placing the gentlemen who composed the com-

mission which took a part in the enactment of the law in question. Five more unexceptionable men than those composing that commission cannot be found in our State; but I do not think, under our Constitution, the Legislature has the authority to thus abnegate the power conferred upon it, and transfer it to any other body not known to our Constitution or laws. In effect, it is an usurpation of legislative functions, and in direct conflict with the provision of our Constitution above last referred to. The review of the question upon this point more than ever confirms me in the correctness of the views I have herein expressed.

I cannot accept the suggestion of counsel for appellant that it is the duty of those members of this Court who do not believe the law to be constitutional to unite in a decision that it is, when the members of the Court are equally divided upon the question, on the ground that they have doubts or should have doubts, when in fact they have none. I do not believe the position sound either in law or morals. I know of no provision of the Constitution or of our statutes, nor of any practice, requiring any such thing to be done; but on the contrary, the law anticipates just such a condition of things as now occurs in this case, and directs just what judgment shall be entered by this Court, without requiring any member of the Court to stultify himself in the manner suggested. Neither do I anticipate any such results from the disposition of the case made as counsel for appellant fears may follow.

The objectionable features of the law, and the illegal manner of its enactment, have been generally and pretty fully discussed and pointed out. With these eliminated, and such other needful changes as will readily suggest themselves to the legislator, I apprehend no difficulty will occur in the enactment of a general tax law which will meet the requirements of the Constitution and the necessities of our people without depriving any citizen of his just and legal rights.

I concur in the opinion of my brother Campbell given in this case, and agree with him that the decree entered therein in the Wayne circuit by Judge Chambers should be affirmed.